**IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **CAREN CALDWELL,** | ) | **CIVIL ACTION NO.** |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **UPMC HEALTH PLAN, INC.** | ) | |
| | ) | |
| **Defendant.** | ) | |

**COMPLAINT**

**I.       PRELIMINARY STATEMENT**

By this action, Plaintiff, Caren Caldwell, seeks back pay, front pay, compensatory damages, punitive damages, and attorneys' fees and costs as a result of Defendant, UPMC Health Plan, failing to promote her and terminating her employment because of her race, Black, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*, and the Civil Rights Act of 1866, 42 U.S.C. § 1981, as amended and Pittsburgh City Code § 659.02. Plaintiff seeks similar remedies as a result of Defendant failing to promote her and terminating her employment because of her age, 60 and 61 during the relevant times, in violation of the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 623(a).

**II.       JURISDICTION**

1.       This court has jurisdiction of this matter by virtue of 28 U.S.C. § 1331, in that this is a civil action wherein the matter in controversy arises under the laws of the United States.

2.       Venue is proper in this judicial district under 28 U.S.C. § 1391(b), in that this is a civil action in which jurisdiction is not founded solely on diversity of citizenship, and the acts

constituting a substantial part of the events and omissions giving rise to the claims occurred in the Western District of Pennsylvania.

3.     On September 26, 2025, Plaintiff filed a Charge of Discrimination with the EEOC against Defendant alleging racial and age discrimination in connection with her claims of failure to promote and termination of her employment. Plaintiff's Charge was dual filed with the PHRC. It was then transferred to the City of Pittsburgh Commission on Human Relations. On July 10, 2026, the EEOC issued Plaintiff a Notice of Right to Sue.[1] On that same date, the City of Pittsburgh Commission on Human Relations issued Plaintiff a right to sue letter.

### III.     PARTIES

4.     Plaintiff, Caren Caldwell ("Caldwell"), born June 26, 1964, is an adult individual who resides at 1421 Riverview Drive, Verona, Pennsylvania 15147. At the time of the incident complained of in this lawsuit and presently, she was and is a citizen of the Commonwealth of Pennsylvania and the United States of America.

5.     Defendant, UPMC Health Plan, Inc., ("UPMC"), is a Pennsylvania Domestic Nonprofit Corporation with a Registered Office located at 600 Grant Street, 55th Floor, Pittsburgh, PA 15219.

### IV.     STATEMENT OF CLAIM

6.     Caldwell began working for Defendant as a Senior Director of Community Health Care ("CHC") Operations in July 2016.

7.     In May 2020, Defendant promoted Caldwell to Associate Vice President & General Manager of Government Products ("AVP").

---

[1] Once the administrative requirements have been exhausted with the PHRC, Plaintiff intends to amend this Complaint to include additional counts against Defendant for race discrimination and age discrimination under the PHRA.

8.    From the time she was promoted through the end of her employment with UPMC, Caldwell was the only Black (non-clinical) individual on the senior leadership team.

9.    As Associate Vice President of Government Products, Caldwell's manager was Brendan Harris ("Harris"), the Vice President of Managed Long-Term Services and Support ("VP of MLTSS"). Harris is White.

10.    From May 2020 through March 2025, Caldwell discussed promotional opportunities with Harris on a regular basis, including in each performance review discussion about her annual goals.

11.    In December 2023, Harris was promoted to President of UPMC for YOU and State Programs.

12.    After Harris was promoted, Defendant posted the VP of MLTSS position.

13.    In approximately late July or early August 2024, Caldwell applied for the promotion to VP of MLTSS. This position came with more than a $40,000 raise in annual pay and would have elevated Caldwell to UPMC Health Plan's senior executive leadership team.

14.    Shortly after Defendant announced Harris's promotion, Caldwell heard from peers, subordinates and staff at the VP/Chief level who expressed their expectation and hope that she would be promoted to Harris's former role. Several individuals even advised that they had already told Harris that Caldwell would be the ideal person for the job.

15.    At the time Caldwell applied for the promotion, she had an exceptional work history, described as follows:

      a.    She had more than 20 years of experience working in leadership positions within the healthcare industry.

b. Caldwell was the key individual responsible for launching Community HealthChoices (CHC) for UPMC Health Plan, which required developing positive relationships with leaders at the PA Department of Long-Term Living and the other two CHC Managed Care Plans (MCOs).

c. Her performance working for Defendant as an AVP was consistently excellent, as evidenced by her highly rated annual performance reviews from 2020-2024. From 2020 through 2023, Caldwell received the highest rating of "Top Performer," and in 2024 received the second highest rating of "Superior Performer."

d. Harris frequently left positive comments in Caldwell's performance evaluations over the past 5 years, such as:

    i. "Caren has done an incredible job stepping into her new role and continues to do a phenomenal job managing our overall operations. Her leadership has been invaluable to move CHC to the point we are now." *2020 Performance Evaluation.*

    ii. "Caren continues to exceed expectations and is a fantastic member of the CHC leadership team." *2021 Performance Evaluation.*

    iii. "Caren continues to carry out her responsibilities at the highest levels and has engaged on new and different efforts beyond just CHC." *2022 Performance Evaluation.*

    iv. "Caren's efforts and engagement continue to help as we look at the future of CHC and ways to optimize and innovate. She is also one of the primary reasons that we have such a strong relationship with our

regulator DHS, as they respect the efforts and engagement from her and her team." *2023 Performance Evaluation.*

    *v.* "Caren's efforts and engagement continue to help support CHC…. She continues to have such a strong relationship with our regulator DHS, as they respect the efforts and engagement from her and her team." *2024 Performance Evaluation.*

e. Caldwell holds a leadership position on a community board at the request/recommendation of John Lovelace, former President of UPMC Government Programs. She also represented UPMC and UPMC Health Plan at community events and forums during her tenure with Defendant and represented UPMC at numerous public presentations, meetings with the PA Department of Human Services, healthcare providers and other interested parties.

f. On multiple occasions, Caldwell had been told by staff at the Office of Long-Term Living and the other two CHC MCOs that they would be concerned if Caldwell left UPMC because of her product knowledge, rapport with key stakeholders and ability to resolve issues and work collaboratively.

g. Shortly before applying for the promotion, Caldwell was listed as a key leader on the 2024 response to the CHC Request for Proposal which would enable UPMC Health Plan to continue to operate CHC.  As a part of this classification, Caldwell had to obtain four external references who had to attest to her competence and skills to be included in the application package.

16.   After submitting her application, Caldwell went through two rounds of interviews with more than 12 individuals, which seemed to go very well. She received all positive feedback from the interviewers, most of whom stated that Plaintiff was the expected and leading candidate for the job.

a.   As an example, Nick Watsula ("Watsula"), one of the interviewers, discussed Caldwell's choice for her second in command as well as the structure of staff that would be working under her in the promoted role. Watsula also told Plaintiff that he knew she was qualified for the job because she was already doing it and thus would not need an introductory period, which Watsula preferred over bringing in a candidate who was new to the line of business.

b.   Similarly, Angela Perri ("Perri"), another interviewer, told Plaintiff that Perri knew from the start of the interview that she wanted Caldwell to receive the promotion because Perri felt she was the only logical candidate. Perri said that she already completed the interview evaluation form and suggested using the interview time to instead focus on what support Caldwell might need in the new position and what ideas Caldwell would like to implement to improve collaboration between lines of business.

17.   In addition, Caldwell was the most experienced candidate for the position. The only interviewer who seemed neutral about Plaintiff's chances of receiving the promotion was Harris.

18.   On March 31, 2025, Harris informed Caldwell that she did not receive the promotion.

6

19.     Harris specifically stated, "you were the leading candidate throughout the process, but we decided to go in a different direction." When Caldwell asked what Harris meant, he said that Defendant chose to promote an internal candidate from a different line of business.

20.     Defendant promoted Heather Hallman ("Hallman"), a substantially younger White female, age 47 at the time, to the position, who was less experienced than Caldwell from a healthcare standpoint and less knowledgeable about the operational and compliance aspects of CHC.

21.     Hallman held a director position (2 levels below the VP position) outside of the CHC line of business prior to her promotion.

22.     Additionally, in the months leading up to Defendant's decision not to promote Plaintiff, Brendan Harris treated Caldwell less favorably than similarly situated White employees. Harris repeatedly canceled one-on-one meetings with Caldwell, began to micromanage her work and his level of engagement with her became accusatory/combative as compared his tone and demeanor during similar conversations with White employees.

23.     Harris also began acting as an advocate for one of Caldwell's White, female colleagues who held a position one level below Plaintiff but generally worked with Caldwell and her team without Harris' input. For example, based on a conversation with the White colleague, Harris made decisions about Plaintiff's team's duties without including her; called Plaintiff (which he never did before) about random emails that the White colleague sent to Caldwell's team. Previously, Harris was not cc'ed on these types of emails or, if he was, Harris took no action regarding the emails. When advised by the Plaintiff that the colleague was wrong, Harris gave a nonchalant apology while at the same time justifying the colleague's behavior. This occurred on multiple occasions.

24.     On July 29, 2025, Defendant told Caldwell that her position was being eliminated and followed up via email with a letter attached stating the same.

25.     Had Caldwell received the promotion, her new position would not have been eliminated, and her employment would not have been terminated. Consistent with this fact, the person who did get the promotion is still in the same position currently.

26.     The failure of Defendant to promote Plaintiff to the vice president position in 2025 was contrary to its pattern of promoting similarly situated White individuals within the line of business/business units, as evidenced by the following:

     a.  Shortly after Plaintiff was promoted in 2020, two White females, Nadine Helbing and Tina Zottola, who held the titles of Senior Director, were given new/additional duties in their finance roles. Harris told Caldwell that he guessed he would have to give the two employees something as recognition for their additional duties. Within weeks of that conversation, Defendant promoted each employee to the AVP level, and, upon information and belief, these positions were not posted and neither employee had to apply for the promoted position.

     b.  Georgean Wielock, who is White, was promoted by Defendant in December 2024 to COO and Senior VP Operations. Upon information and belief, this position was never posted.

     c.  Aaron Horsfield, who is White, was promoted by Defendant in February 2025 to Senior Director Plan Operations, a newly created position. Upon information and belief, this position was not posted.

d. Joshua Hovanec, who is White, was promoted by Defendant in February 2025 within the business unit to Director CHC Network. Upon information and belief, this position was not posted.

e. Andy Yohe, who is White, was promoted by Defendant in January 2025 within the business unit to President and Chief Executive Officer of Work Partners.

f. Dan LaValle, who is White, was promoted by Defendant in May 2025 to Associate Vice President of Community Engagement. Upon information and belief, this position was not posted.

g. David Gingerich and Marissa Ables-Dawson, both White, were promoted by Defendant within their lines of business in June 2025 to AVP level positions. Upon information and belief, neither position was posted.

27. Simultaneously, Defendant has a pattern of failing to promote Black females over 40 years old to available roles, as evidenced by its failure to promote the following Black females, in addition to Caldwell:

a. In 2024, Dr. Crystal Clark, a Black woman approximately age early 60s, Chief Medical Officer of Community Health Choices, who has been with Defendant since 2019, failed to be considered for the promotion to UPMC Health Plan Chief Medical Officer upon the announced retirement of her supervisor. Defendant never even notified Clark of the job posting. When she required about being promoted, Dr. Clark's retiring supervisor told Dr. Clark she "could apply if she wanted". A male physician was ultimately hired for that role.

9

b. Then, a second male physician was hired in the CHC line of business. Hiring the second male physician essentially acted as a demotion for Dr. Clark, as it created a new level of authority between Dr. Clark and the UPMC CMO. The second physician, now also Dr. Clark's supervisor, had no Pennsylvania CHC experience.

c. In December 2024, Kim Maddox (Caldwell's former direct report), approximately age early 60s, was slated to be promoted from Director to Senior Director based on her previous performance and accomplishments. She managed the community engagement activities for CHC and worked closely with both the Medicaid and Medicare teams. She is also licensed to sell the Medicare product which made her even more valuable from a government products perspective. Discussions about combing the community efforts of all three lines of business meant that someone with Kim's experience would be ideal and this was discussed many times with Harris. Instead, as part of this restructuring, Defendant awarded the position to Dan Lavelle (no product knowledge), making Maddox report to Lavelle. On the call when the promotion was announced, both Harris and Lavelle even gave Maddox kudos about what a great job she did and that she should help Lavelle to get up to speed.

28. Defendant's stated reasons for denying Plaintiff the promotion and terminating Plaintiff's employment were pretext for the real reasons, her race and age. The above evidence establishes that Defendant did not want Black individuals close to the typical retirement age on its executive leadership team.

10

29.     Defendant's actions caused Plaintiff to suffer wage loss, embarrassment and humiliation, harm to her career, and emotional distress.

## V.     CLAIMS FOR RELIEF

### COUNT I – VIOLATION OF TITLE VII – RACE – FAILURE TO PROMOTE

30.     Plaintiff incorporates by reference the averments contained in all preceding paragraphs as if fully set forth herein.

31.     Defendant has intentionally and willfully engaged in a series of unlawful acts, practices, policies, and procedures in discriminating against Plaintiff with respect to compensation, terms, conditions, or privileges of employment in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq*.

32.     As a result of Defendant's actions, described in particularity above, Plaintiff has been discriminated against because of her race, Black, through Defendant's failure to promote her to Vice President of Managed Long-Term Services and Support, in violation of Title VII of the Civil Rights Act of 1964, as amended.

33.     Plaintiff has been directly harmed because of these violations as is fully set forth above.

### COUNT II – VIOLATION OF TITLE VII – RACE  – TERMINATION

34.     Plaintiff incorporates by reference the averments contained in all preceding paragraphs as if fully set forth herein.

35.     Defendant has intentionally and willfully engaged in a series of unlawful acts, practices, policies, and procedures in discriminating against Plaintiff with respect to compensation, terms, conditions, or privileges of employment in violation of the Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e.

11

36. Defendant's unlawful acts, practices, policies and/or procedures in employment, and specifically its decision to terminate Plaintiff's employment, were induced by its intent to discriminate against Plaintiff on the basis of her race, Black.

37. Plaintiff has been directly harmed as a result of Defendant's violations as is fully set forth above.

## COUNT III – VIOLATION OF SECTION 1981

38. Plaintiff incorporates by reference the averments contained in the preceding paragraphs above as if set forth fully herein.

39. Defendant failed to promote Plaintiff and terminated Plaintiff's employment because of her race, Black.

40. Defendant's actions in refusing to promote Plaintiff and terminating Plaintiff's employment because of her race deprived her of the same right to make and enforce contracts as is enjoyed by White citizens, in violation of the Civil Rights Act of 1866, as amended 42 U.S.C. § 1981.

41. Plaintiff has been directly harmed as a result of these violations as is fully set forth above.

## COUNT IV – VIOLATION OF ADEA – FAILURE TO PROMOTE

42. Plaintiff incorporates the averments contained in the preceding paragraphs above as if set forth fully herein.

43. Defendant intentionally and willfully engaged in a series of unlawful acts, practices, policies, and procedures in discriminating against Caldwell with respect to compensation, terms, conditions, or privileges of employment in violation of the Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 621-634.

44. Defendant's unlawful acts, practices, policies and/or procedures in employment were induced because of its intent to discriminate against Caldwell based on her age as set forth above.

45. Plaintiff has been directly harmed because of these violations as is fully set forth above.

## COUNT V – VIOLATION OF ADEA – TERMINATION

46. Plaintiff incorporates the averments contained in the preceding paragraphs above as if set forth fully herein.

47. Defendant intentionally and willfully engaged in a series of unlawful acts, practices, policies, and procedures in discriminating against Caldwell with respect to compensation, terms, conditions, or privileges of employment in violation of the Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 621-634.

48. Defendant's unlawful acts, practices, policies and/or procedures in employment were induced because of its intent to discriminate against Caldwell based on her age as set forth above.

49. Plaintiff has been directly harmed because of these violations as is fully set forth above.

## COUNT VI – VIOLATION OF PITTSBURGH CITY CODE § 659.02 – RACE

50. Plaintiff incorporates the averments contained in the preceding paragraphs above as if set forth fully herein.

51. Defendant intentionally and willfully engaged in a series of unlawful acts, practices, policies, and procedures in discriminating against Caldwell with respect to hiring,

compensation, promotion, discharge, or other terms conditions or privileges of employment in violation of Pittsburgh City Code § 659.02.

52. Defendant's unlawful acts, practices, policies and/or procedures in employment, and specifically its decisions not to promote Plaintiff and to terminate Plaintiff's employment, were induced by its intent to discriminate against Plaintiff on the basis of her race, Black.

53. Plaintiff has been directly harmed because of these violations as is fully set forth above.

## COUNT VII – VIOLATION OF PITTSBURGH CITY CODE § 659.02 – AGE

54. Plaintiff incorporates the averments contained in the preceding paragraphs above as if set forth fully herein.

55. Defendant intentionally and willfully engaged in a series of unlawful acts, practices, policies, and procedures in discriminating against Caldwell with respect to hiring, compensation, promotion, discharge, or other terms conditions or privileges of employment in violation of Pittsburgh City Code § 659.02.

56. Defendant's unlawful acts, practices, policies and/or procedures in employment, and specifically its decisions not to promote Plaintiff and to terminate Plaintiff's employment, were induced by its intent to discriminate against Plaintiff on the basis of her age.

57. Plaintiff has been directly harmed because of these violations as is fully set forth above.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully prays that this Honorable Court will:

(a)    Assume jurisdiction herein;

(b)    Declare Defendant's conduct to be unlawful and an intentional violation of Plaintiff's rights;

(c)    Award Plaintiff wage loss damages, including back pay, front pay, damages associated with the increased tax burden of any award, and lost fringe and other benefits of employment, including health, dental, and vision benefits;

(d)    Award Plaintiff compensatory damages under Title VII, Section 1981 and the Pittsburgh City Code;

(e)    Award Plaintiff liquidated damages under the ADEA;

(f)    Award Plaintiff punitive damages under Title VII and Section 1981;

(g)    Award Plaintiff pre and post-judgment interest;

(h)    Award Plaintiff costs and attorneys' fees under all counts; and

(i)    Grant such other relief as the Court deems just and appropriate.

Respectfully Submitted,

**JURY TRIAL DEMANDED**    s/ David B. Spear

David B. Spear
PA Id. No. 62133

s/ Gabrielle K. Shaulis
Gabrielle K. Shaulis
PA Id. No. 334275

Minto Law Group, LLC
811 Camp Horne Road Suite 320
Pittsburgh, PA 15237